Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1915 | **DATE** | 7/20/2004 |
| **CASE TITLE** | Kirti A. Mehta vs. Des Plaines Development Ltd. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  ENTER MEMORANDUM OPINION: Plaintiff's motion for summary judgment is denied, and the defendants' motion is granted in part. Counts I and II of the complaint are dismissed with prejudice. Summary judgment is entered in favor of the defendants and against the plaintiff on counts III and IV. Further, Sandra Rzeszutko's counterclaim is dismissed. [84-1]

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL 2 2 2004 date docketed | 90 |
| | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 7/20/2004 date mailed notice | |
| AMM courtroom deputy's initials | | AMM6 mailing deputy initials | |

CLERK, U.S. DISTRICT COURT

2004 JUL 21 PM 4: 28

Date/time received in central Clerk's Office

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KIRTI A. MEHTA,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )    No. 01 C 1915
                                         )
DES PLAINES DEVELOPMENT LIMITED,         )
Trading as Harrah's Joliet Casino        )
& Hotel, SANDRA RZESZUTKO, JOHN          )
PARSONS, FRAN FEHRENBACH, VINCE          )
DONLEVIE, and THOMAS MUELLER,            )
                                         )
            Defendants.                  )

**DOCKETED**

**JUL 2 2 2004**

**MEMORANDUM OPINION**

Before the court are the parties' cross-motions for summary judgment on both plaintiff's complaint and defendant Sandra Rzeszutko's counterclaim. For the reasons stated below, plaintiff's motion for summary judgment is denied, and defendants' motion is granted in part.

**BACKGROUND**

This is a civil rights action brought by pro se plaintiff Kirti A. Mehta against Des Plaines Development Limited, also known as Harrah's Joliet Casino & Hotel ("Harrah's") and Harrah's employees or former employees Sandra Rzeszutko, John Parsons, Fran Fehrenbach, Vince Donlevie, and Thomas Mueller. The thrust of the complaint is that defendants discriminated against plaintiff because of his national origin. (Mehta is originally from India.)

The following facts are taken largely from the defendants'
Local Rule 56.1(a)(3) Statement of Facts and plaintiff's deposition
testimony. These facts are undisputed except as indicated and
where plaintiff's version of the facts is noted. Defendants have
objected to the procedural inadequacies of plaintiff's submissions,
most notably his failure to comply with Local Rule 56.1. We have
a duty, however, to apply a more lenient standard to pro se
parties. Although plaintiff's failure to comply with the local
rules might provide adequate reason to rule against him, we will
instead evaluate his arguments on the merits.

In 1996, plaintiff began going to Harrah's to gamble. Some
time later, he enrolled in Harrah's "Total Rewards" customer
loyalty program.[1] Plaintiff enrolled in the program because he saw
a Harrah's newspaper advertisement allegedly stating that Total
Rewards members would be reimbursed 50 percent of the amount they
gamble (their "play"). Plaintiff's problems with Harrah's began
the first time he gambled after having enrolled in Total Rewards.
Plaintiff lost $900.00 and complained to personnel at the Total
Rewards Center (in the casino) that he was entitled to be

---

[1] In his deposition, plaintiff complained that Parul, his girlfriend at
the time who later became his wife (and from whom he is now divorced), was denied
membership in Total Rewards because she did not have an Illinois driver's license
and Harrah's would not accept her Indian passport as identification. Plaintiff
speculated that this denial is evidence of discrimination against her because he
later noticed that Harrah's accepted as identification passports issued by other
countries, such as Russia, Germany, and the United Kingdom. In any event, Parul
is not a party to this action, and none of the claims in the complaint are based
upon this purported denial of Total Rewards membership.

reimbursed for 50 percent of $900.00. Harrah's personnel informed him that he would only be reimbursed up to $100.00. According to plaintiff, he never received the $100.00 reimbursement, and the dispute over it continued "all the way through" 1999. (Defendants' Motion for Summary Judgment, Ex. F, Mehta Dep. Tr. at 46-47.)

Nonetheless, plaintiff continued to gamble at Harrah's about three to four times a week. A few years went by without incident, during which plaintiff attained "Platinum" status in the Total Rewards program based on his level of play.[2] As a result, plaintiff began receiving complimentary rewards ("comps") from Harrah's, such as meals, drinks, and hotel stays.

One day in December 1999, plaintiff gambled at Harrah's and received a comp ticket for four meals at Harrah's buffet restaurant. The next day, he returned with his four children and his wife to dine at the buffet. When plaintiff tried to redeem his comp ticket at the buffet cashier's counter, a Total Rewards supervisor named Sue (who has not been named as a defendant) rushed over to the counter along with another supervisor and confiscated the comp ticket. According to plaintiff, Sue told him that he was not entitled to the comp and said, "You beggar. Go back to the

---

[2]  Harrah's tracks the slot machine play of Total Rewards members by issuing a card that is much like a credit card. A Total Rewards member inserts the card into an electronic card reader attached to a slot machine, and the customer's gambling activity is recorded. (Defendants' Motion for Summary Judgment, Ex. E.)

country where you come from." (Mehta Dep. Tr. at 53-55.)
Plaintiff and his family walked out without having a meal.

After that incident, plaintiff continued gambling at Harrah's.
The next problem occurred in March 2000. Plaintiff was playing
slot machines and told a slot supervisor, Mike Pavich (who is not
a defendant), that Harrah's had "ripped [plaintiff] off." (Mehta
Dep. Tr. at 72.) Plaintiff was referring to the $100.00 that he
claims Harrah's owed him due to his play years ago, after he had
first enrolled in Total Rewards. Plaintiff asserts that Mr. Pavich
issued him a $100.00 voucher by making a computer entry. When
plaintiff went to the Total Rewards Center about a week later to
claim his voucher, the woman named Sue (with whom plaintiff had the
run-in at the buffet) refused to issue the voucher. Thereafter,
plaintiff contacted various casino personnel by telephone, asking
that the voucher be issued.

A week or two later, plaintiff went to the VIP Lounge and
spoke with Mr. Pavich's supervisor, defendant Fran Fehrenbach.
Fehrenbach refused to issue the voucher to plaintiff and told him
that it was a moot point because the $100.00 credit never existed.
Plaintiff also brought two other complaints to Fehrenbach's
attention. One was that plaintiff had written a check to Harrah's
for $5.00 that had been cashed for $500.00. The other issue had to
do with a "Wheel of Fortune" slot machine that plaintiff claimed
was "fixed" because he had lost a lot of money playing the machine

and had never received a "bonus spin" while playing. Fehrenbach denied that the game was "fixed."

After the conversation, plaintiff turned around and was leaving the VIP Lounge when he purportedly heard someone use the term "camel jockey." Plaintiff states that he doesn't know who said it, but it "sounded like [Fehrenbach] to [him]." (Mehta Dep. Tr. at 94.) (Fehrenbach denies it.) There were other customers in the same area of the VIP Lounge at the time.

Clashes between plaintiff and Harrah's continued to occur. On June 29, 2000, Harrah's overcharged plaintiff for a hotel stay. According to plaintiff, Harrah's compensated for the error by giving him two dinner buffet comps, each for six people (plaintiff, his wife, and the four children), and a two-night hotel suite stay. Harrah's had originally issued a comp for a two-night stay in a standard hotel room, but plaintiff protested that he wanted a suite, and plaintiff alleges that an employee added the word "suite" to the comp ticket.

On July 20, 2000, plaintiff complained to VIP Lounge employees that he was not credited for table game play. On July 27, 2000, plaintiff tried to get comps from various Total Rewards representatives for four buffet dinners, but was denied. Around that time, plaintiff tried several times to use the dinner vouchers that were issued for the June overcharge, but was told that they would not be honored.

In October 2000, plaintiff phoned Harrah's, attempting to reserve his purportedly-comped two-night suite stay, and was told that the comp would not be honored by phone and that he should bring the comp voucher with him in person. On October 12, 2000, he and his wife checked into the hotel and plaintiff attempted to redeem his suite stay comp again. Plaintiff showed his comp voucher to defendant Thomas Mueller, a hotel supervisor. Mueller called non-defendant Jeff Kasuda, Executive Host, to the hotel desk. Kasuda refused to give plaintiff a suite and stated that the original hotel voucher did not have the word "suite" written on it. Mueller and Kasuda took the voucher, but plaintiff asked to see the voucher again, quickly put it in his pocket, and walked away. Plaintiff alleges that as he was walking away, he heard Kasuda ask Mueller whether "that fucking Indian" had checked in. Mueller said yes.

Plaintiff gambled all night in the casino and returned to his hotel room early the next morning. Defendant Vince Donlevie, Vice-President of Operations, called plaintiff in his hotel room. Donlevie was angry about the previous night's incident, but according to plaintiff stated that he would look into the situation and that Harrah's would accommodate plaintiff if it was true that plaintiff had received a comp for a suite. (Donlevie later sent plaintiff a letter stating that a two-night comp would be honored in December for a standard room, but not for a suite.)

Plaintiff sent a fax to Donlevie and Mueller on November 1, 2000, threatening suit for violation of his civil rights. Donlevie referred the matter to Harrah's general counsel. The same day, plaintiff brought his family to the buffet for dinner and attempted to use a comp that he had just received at the Total Rewards Center. A Total Rewards supervisor came to the buffet and told the restaurant manager not to honor plaintiff's comp. The restaurant manager honored plaintiff's comp anyway.

On November 9, 2000, Harrah's Vice President of Legal Affairs sent plaintiff a letter indicating that Harrah's believed that any lawsuit by plaintiff would be frivolous. In addition, the letter suggested that plaintiff take his business elsewhere and noted that Harrah's would no longer issue plaintiff "service recoveries"[3] or direct mail solicitations (offering room comps or discounts).

On November 9 or 10, 2000, plaintiff was gambling and received a $43.00 comp. He asked a Total Rewards representative, non-defendant Heather Shaw, if the comp could be dated so that he could use it on November 20 to buy his daughter a birthday dinner. (Vouchers are valid only for a specified length of time.) Shaw agreed and dated the voucher accordingly.

On November 20, 2000, presumably after plaintiff had received the November 9 letter from Harrah's, plaintiff and his family went

---

[3] A "service recovery" evidently refers to a comp issued to a customer to compensate for poor service or an inconvenience caused by Harrah's.

to the buffet, intending to redeem the $43.00 comp voucher. When plaintiff presented the voucher to the cashier, she recognized plaintiff from the incident on November 1 and immediately took the voucher to the Total Rewards Center. Plaintiff asked to see the restaurant manager, who was not there. Defendant John Parsons, the Food & Beverage Manager, approached plaintiff and asked him to move to the center of the pavilion by the buffet. Plaintiff stated that he wanted the voucher back, and Parsons indicated that the cashier had taken it to the Total Rewards Center.

Defendant Sandra Rzeszutko, who was the Total Rewards representative who had issued the comp voucher, then joined plaintiff and Parsons. Rzeszutko had the voucher in her hand and told plaintiff that it was invalid. Plaintiff pulled the voucher out of Rzeszutko's hand. According to plaintiff, she grabbed plaintiff's hand to get the voucher back. Rzeszutko, on the other hand, claims that plaintiff grabbed and twisted her hand to take the voucher, and that she did not have a chance to grab it back because plaintiff began to walk away. Parsons told plaintiff that plaintiff could not leave with the voucher because it was Harrah's property.[4]

---

[4] Plaintiff claims that this incident was videotaped by Harrah's and that Harrah's has refused to turn over the tape or has purposefully erased it. The tape (or rather, the question of its existence) was one of the subjects of countless discovery disputes in this case. The upshot appears to be that the area in question, and therefore the voucher incident, was not videotaped. Throughout the state court litigation and in this action, Harrah's has supplied affidavits to that effect. Plaintiff maintains that the incident must have been videotaped, but he has no evidence to support this conclusory assertion.

Parsons, along with Harrah's security personnel, followed defendant and his family into Harrah's parking garage. Then Mike Follenweider, a Guest Safety (Security) Trainer, arrived. Plaintiff alleges that he explained the situation to Follenweider. Plaintiff also told Follenweider that plaintiff had contacted Donlevie regarding Harrah's "discrimination." According to plaintiff, Follenweider said that he knew about plaintiff's threat of legal action but that it had nothing to do with the current situation and that plaintiff had to return the voucher because it was Harrah's property. Plaintiff refused to return the voucher.

Eventually, Officer Thomas Stein arrived at the garage. He was a City of Joliet police officer specially assigned to Harrah's, paid for his time by the City and not directly by Harrah's. (While the incident was unfolding, Harrah's security personnel had contacted Officer Stein, who was directing traffic in the valet parking area, and asked him to go to the parking garage.) Officer Stein spoke to plaintiff, who explained the situation, and then spoke to Follenweider and Parsons privately in the garage stairwell. Follenweider and Parsons explained to Officer Stein what had happened between plaintiff and Rzeszutko. When Officer Stein returned to plaintiff, he placed plaintiff under arrest. A scuffle occurred when Officer Stein attempted to handcuff plaintiff, although plaintiff claims that he did not resist arrest.

Plaintiff asserts that he heard Officer Stein use the word "Palestinian" during the scuffle.[5] (Officer Stein denies it.)

Afterward, plaintiff was taken to the police station and charged with battery (to Rzeszutko) and resisting a police officer. The case eventually went to trial in state court, and a jury convicted plaintiff of both charges. Plaintiff was sentenced to a term of conditional discharge.

Based on the events of November 20, 2000 and his previous disputes with Harrah's, plaintiff filed the complaint in the instant action on March 20, 2001. The complaint contains four counts: national origin discrimination in defendants' refusal to honor plaintiff's comps (Count I); denial of comps in retaliation for plaintiff's having protested the alleged national origin discrimination (Count II); willful and wanton misconduct and collusion with Joliet police in falsely charging plaintiff with battery (Count III); and violation of plaintiff's civil rights in relation to plaintiff's arrest for battery and resisting arrest (Count IV). Plaintiff seeks $5 million in damages.

Defendant Sandra Rzeszutko has filed a one-count counterclaim for assault and battery.

---

[5] There is a videotape of the altercation in the parking garage. Plaintiff claims that the videotape is incomplete, but he does not submit any evidence tending to show that it is incomplete.

Defendants move for summary judgment on both the complaint and the counterclaim. Plaintiff cross-moves for summary judgment on the complaint and counterclaim as well.

## **DISCUSSION**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

A.   **Cross-Motions for Summary Judgment on the Complaint**

   1.   **Counts I and II**

Before reaching the issue of summary judgment, we must first attempt to ascertain from the complaint precisely what claims plaintiff is bringing.  Counts I and II involve the denial of, or refusal to honor, plaintiff's comps.  Viewing the complaint very liberally, it appears that Count I could assert a claim of national origin discrimination in a place of public accommodation in violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a.  Similarly, Count II could allege a claim for retaliation for plaintiff's having sent Harrah's a letter protesting the purported discrimination, in violation of 42 U.S.C. § 2000a-2.  If we construed Counts I and II in this way, however, the claims would have to be dismissed because there is no evidence that plaintiff has met the procedural and jurisdictional requirement of 42 U.S.C. 2000a-3.  Section 2000a-3(c) requires a Title II plaintiff, prior to filing suit in federal court, to give notice to state or local authorities when a state or local law prohibits the complained-of discrimination and the state or local authority is authorized to grant or seek relief from such discrimination.  These conditions are satisfied in Illinois.  <u>See</u> <u>Stearnes v. Baur's Opera House, Inc.</u>, 3 F.3d 1142, 1145 (7th Cir. 1993).  In addition, we note that a prevailing plaintiff in a Title II action cannot recover damages; he can only obtain injunctive relief and reasonable attorney's

fees. See Newman v. Piggie Park Enters., 390 U.S. 400, 401-02
(1968); Sprogis v. United Air Lines, Inc., 517 F.2d 387, 391 n.5
(7th Cir. 1975).

We would also have to dismiss Counts I and II if we construed
them as attempting to state claims pursuant to 42 U.S.C. § 1981,
which provides that "[a]ll persons . . . shall have the same right
. . . to make and enforce contracts . . . as is enjoyed by white
citizens."[6]  Plaintiff fails to state claims under § 1981 because
he alleges discrimination based solely on the fact that he is
foreign-born.[7]  "[C]laims founded on that status are not cognizable
under section 1981, which is designed to remedy discrimination
based on race or ethnicity." Von Zuckerstein v. Argonne Nat'l
Lab., 984 F.2d 1467, 1472 (7th Cir. 1993).  In Von Zuckerstein, the
Seventh Circuit acknowledged that "the line between national origin
and race or ethnicity for section 1981 claims cannot be bright,"

---

[6]  "[T]he term 'make and enforce contracts' includes the making,
performance, modification, and termination of contracts, and the enjoyment of all
benefits, privileges, terms, and conditions of the contractual relationship."
42 U.S.C. § 1981(b).  The protections of § 1981 thus "center on contractual
rights."  Walker v. Abbott Labs., 340 F.3d 471, 475 (7th Cir. 2003).  If
plaintiff had stated a § 1981 claim, he would have had to prove, inter alia, that
his relationship with Harrah's was contractual in order to survive summary
judgment.  This is a doubtful proposition.

[7]  Count I is labeled "Civil Rights Violation: NATIONAL ORIGIN" and
states: "This action arises from civil rights violation because of MEHTA's
national origin."  It alleges that Harrah's engaged in "differential treatment"
"not given to White &/or Black race but those who look foreigner."  It also
alleges that Harrah's did not honor plaintiff's comps "because of MEHTA's
national origin" and that Harrah's treats "foreigner[s]" differently.
(Complaint, ¶¶ 1, 2, 6, 7 (boldface in original).)  Plaintiff maintains
throughout his briefs that his claims relate to "national origin" discrimination.
    The complaint does not specify plaintiff's national origin, but plaintiff
testified that he is Indian.  (Mehta Dep. Tr. at 24.)

id., citing St. Francis College v. Al-Khazraji, 481 U.S. 604, 613
(1987). In Al-Khazraji, the Supreme Court held that § 1981
proscribes not only racial discrimination, but also discrimination
based on "ancestry or ethnic characteristics . . . rather than
solely on the place or nation of his origin." Id. Here, as
explained in detail supra n.7, we do not have a line-drawing
problem because plaintiff complains that he was discriminated
against because he is foreign-born, not because of his particular
race, ancestry, or ethnicity. In fact, the complaint does not even
include an allegation regarding plaintiff's race or ancestry, see
supra n.7.

It does not appear that Counts I and II can be construed as
stating a claim under any other civil rights statute. Accordingly,
Counts I and II of the complaint will be dismissed.

## 2. **Counts III and IV**

Plaintiff does not fare much better with respect to Counts III
and IV, which relate to the events of November 20, 2000. Count III
alleges "willful and wanton misconduct" in that Harrah's
purportedly colluded with Joliet police to falsely charge plaintiff
with battery and arrest. Count IV is based on the same alleged
conduct, but plaintiff styles this claim as one for violation of

his Fourth Amendment rights.[8]  As with Counts I and II, neither count specifies under what statute it is brought.

Let us first suppose that Count III or IV is a 42 U.S.C. § 1983 claim for subjecting plaintiff to an unlawful arrest.  To recover under § 1983, plaintiff must show that defendants acted "under color of state law" in depriving plaintiff of his federally protected rights.  Case v. Milewski, 327 F.3d 564, 566 (7th Cir. 2003).  All of the defendants here are private citizens or entities.  "[T]here are two circumstances in which private citizens can be brought within the grasp of section 1983 even though the statute is limited to acts under color of state law."  Proffitt v. Ridgway, 279 F.3d 503, 507 (7th Cir. 2002).  "First and more common, the citizen may have conspired with a public employee to deprive the plaintiff of his constitutional rights."  Id. at 507.  Second, the private citizen may have been "deputized" by police in order to help officers enforce the law.  See id. at 507-08.  Plaintiff relies on the former theory and argues that Harrah's and its employees conspired with Joliet police officers to deprive plaintiff of his rights.

---

[8]  In Count IV, plaintiff also refers to "excessive force" purportedly used in the arrest and asserts that he did not resist arrest.  Nevertheless, he failed to name Officer Stein or the City of Joliet as defendants.  Moreover, plaintiff's allegation that he did not resist arrest is an impermissible collateral attack on his state court conviction.

Although plaintiff styles Count IV as a Fourth Amendment claim, it is more appropriately read as a Fourteenth Amendment equal protection claim.

"In cases involving private entities open to the public, courts have held that a conspiracy can be shown by evidence of a customary arrangement or pre-existing agreement between the entity and the police 'under which the police simply carry out the private entity's directions.'" <u>Stewart v. Harrah's Illinois Corp.</u>, No. 98 C 5550, 2000 WL 988193, at *10 (N.D. Ill. July 18, 2000). In circumstances where private security guards detain individuals, courts have found conspiracies between the private actors and police where "the police allow the security guard's judgment about whether probable cause exists to be substituted for their own." <u>Id.</u>

Here, there is no evidence of a pre-existing agreement between Harrah's and Joliet police pursuant to which police simply carry out the directions of Harrah's employees, nor is there evidence that Officer Stein allowed Harrah's security force to substitute their judgment for his. Rather, the evidence is to the contrary. Officer Stein testified that Harrah's security force had no authority to order or direct Joliet police officers to make arrests. (Defendants' Motion for Summary Judgment, Ex. J, Stein Dep. Tr. at 54.) Before arresting plaintiff, Officer Stein spoke with John Parsons, who witnessed the incident with Rzeszutko; and Mike Follenweider, the Security Trainer who spoke with plaintiff in the garage. (<u>Id.</u>, Ex. E; Ex. I, Follenweider Dep. Tr. at 31.) Officer Stein stated that, after speaking with Follenweider, he

made the independent conclusion that probable cause existed to arrest plaintiff. (Stein Dep. Tr. at 17-18.)

Because there is no indication that Officer Stein allowed the judgment of Harrah's employees to be substituted for his own, but rather that he made his own judgment regarding probable cause, there is no genuine issue regarding state action, a requirement of a § 1983 claim. Accordingly, if either Count III or Count IV is construed as a § 1983 claim, it is appropriate to grant summary judgment in favor of defendants on that claim.

It is also possible that Count III or IV could be construed as a claim under 42 U.S.C. § 1985(3), which prohibits private conspiracies to deprive persons of their civil rights. "To establish a claim for civil conspiracy under § 1985(3), a plaintiff must demonstrate (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." Green v. Benden, 281 F.3d 661, 665 (7th Cir. 2002). "The plaintiff also must show some racial, or otherwise class-based, invidiously discriminatory animus behind the conspirators' actions, and that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment." Id.

The evidence shows that there is no genuine issue regarding a discriminatory animus behind defendants' actions on November 20, 2000, the subject of Counts III and IV. We note initially that there is no evidence that defendants Fehrenbach, Donlevie, or Mueller were involved in the November 20 incident. (The only wrongful conduct alleged against those defendants relates to Counts I and II, the denial of comps.) Moreover, the statements about which plaintiff testified are insufficient to establish a genuine issue regarding a discriminatory motive for the report of battery and plaintiff's subsequent arrest. There are four remarks in question: (1) "You beggar. Go back to the country where you come from," purportedly made by a supervisor named Sue; (2) "camel jockey," which plaintiff believes to have been made by defendant Fehrenbach; (3) "that fucking Indian," purportedly made by Kasuda; and (4) "Palestinian," purportedly made by Officer Stein. The first three statements are alleged to have occurred earlier than November 20, 2000 and do not relate to the arrest of plaintiff, but to the denial of comps. Furthermore, there is no evidence that the persons allegedly making the remarks were present or involved in the November 20 incident. Plaintiff fails to create a genuine issue as to the last alleged statement as well because the remark occurred after the decision to arrest plaintiff had already been made. According to plaintiff, the statement was made during the scuffle, after Officer Stein had told plaintiff that he was under

arrest and had handcuffed plaintiff. In addition, the remark does not bear on the intent of Harrah's or its employees whatsoever. Given the lack of evidence of a discriminatory motive behind defendants' actions, defendants will be granted summary judgment on plaintiff's § 1985(3) claim.

There is a final possibility of claim construction, and that is that Count III is a state-law false arrest claim. Pursuant to 28 U.S.C. § 1367(c)(3), we are permitted to decline to exercise supplemental jurisdiction over a state-law claim if we have dismissed all claims over which we have original jurisdiction. Having resolved the federal questions in this action, we decline to exercise supplemental jurisdiction over Count III, and Count III will be dismissed to the extent it can be construed as claim arising under state law.

One final matter concerning the complaint must be addressed. Plaintiff has not filed a formal motion, but requests in his supplemental brief in support of summary judgment that he be allowed to amend the complaint to add the City of Joliet and/or the Joliet Police Department as defendants. Plaintiff refers to "newly discovered evidence reveal[ed] on June 27, 2003," the date that the deposition of Officer Stein was taken. We are unpersuaded. Plaintiff had enough information from the outset to determine whether he wanted to sue any Joliet defendants. Based on his insufficient explanation for his failure to add the defendants in

a timely fashion, the undue delay, and the prejudice that would result, plaintiff's request for leave to amend the complaint is denied.

**B.   Cross-Motions for Summary Judgment on the Counterclaim**

Defendant Sandra Rzeszutko's counterclaim is for assault and battery, a state-law claim.  As with Count III of the complaint, we decline to exercise supplemental jurisdiction over this state-law claim as well.  Therefore, the counterclaim will be dismissed.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied.

Defendants' motion is granted in part.  Counts I and II of the complaint are dismissed with prejudice.  Summary judgment is entered in favor of the defendants and against the plaintiff on Counts III and IV.  To the extent that Count III asserts a state-law claim, we decline to exercise supplemental jurisdiction over it and is therefore dismissed.  We also decline to exercise supplemental jurisdiction over defendant Sandra Rzeszutko's counterclaim, and it is dismissed.

DATE:      July 20, 2004

ENTER:   _____

John F. Grady, United States District Judge